95 A.3d 269

**The SCHOOL REFORM COMMISSION and The School District of Philadelphia, Petitioners**

v.

**PHILADELPHIA FEDERATION OF TEACHERS, LOCAL 3, AFT, AFL–CIO, Respondent.**

**No. 47 EM 2014.**

Supreme Court of Pennsylvania.

June 26, 2014.

## ORDER

PER CURIAM.

**AND NOW,** this 26th day of June, 2014, the Application for Leave to File *Amicus Curiae* Brief filed by the Pennsylvania

---

1. This issue has been abbreviated because, as stated verbatim, it was unnecessarily argumentative.

Department of Education and the Acting Secretary of Education, the Application for Leave to File *Amicus Curiae* Brief filed by the Alliance for Philadelphia Public Schools, the Application for Leave to File *Amicus Curiae* Brief filed by StudentsFirst, and the Application for Leave to File Amended Statement of *Amicus Curiae* Senator Lawrence M. Farnese *et al.*, the Application for Leave to File *Amicus Curiae* Brief in Support of Petitioners, filed by Philadelphia School Partnership and PennCAN, and the Application for Leave to File a Statement of *Amicus Curiae* in Support of Response, filed by Robert M. McCord, are **GRANTED.** The Application for Leave to File Reply is **GRANTED.** The Application for Leave to File Original Process and Exclusive Jurisdiction Complaint for Declaratory Judgment is **DENIED.**

Chief Justice CASTILLE files a dissenting statement which is joined by Justice BAER.

Chief Justice CASTILLE, dissenting.

The issue at this stage is jurisdictional: does the instant controversy fall within our exclusive jurisdiction. The Court declines, without comment, the Application for Leave to File Original Process and Exclusive Jurisdiction Complaint for Declaratory Judgment. I believe the jurisdictional issue at the very least is debatable, and in the end, I conclude that we are obliged to entertain the Complaint. Hence, I respectfully dissent.

This case concerns the School District of Philadelphia ("School District"), which has experienced significant financial challenges for more than a decade. At the commencement of the 2001–02 school year, there was a $200 million operating shortfall in the School District's $2 billion budget. In December 2001, the Secretary of Education declared the School District to be in distress per Section 691 of the Act of Apr. 27, 1998, P.L. 270, No. 46 ("Act 1998–46"). This declaration triggered a total change in the governance of the School District: The Philadelphia Board of School Directors was suspended, and the School Reform Commission ("SRC") was

immediately formed to oversee the School District. The SRC, which is comprised of unelected members who are appointed by the Governor and the Mayor of Philadelphia, has broad powers that no other governing body of a school district in Pennsylvania possesses. Section 696 of Act 1998–46 granted the SRC sweeping powers, including the power to avoid strictures typically placed on a school district with respect to staffing. For example, the SRC was authorized to close or reconstitute schools, including reassigning, suspending or dismissing professional employees notwithstanding other provisions of the Public School Code. Additionally, the SRC was authorized to suspend professional employees without regard to the School Code provision relating to seniority preferences. *See*, 24 P.S. § 6–696(i)(6) and (7).

Section 696 also radically shifted the balance of power in the collective bargaining process. Employees are prohibited from striking while the School District is under SRC control. *See* 24 P.S. § 6–696(*l*). Section 696 also granted management more authority, stating that the SRC is not required to engage in collective bargaining negotiations with respect to a host of issues, including reductions in the work force, staffing patterns and assignments, and contracts with third parties for the provision of goods and services. *See* 24 P.S. § 6–696(k)(2).

The General Assembly altered how litigation with respect to certain Act 1998–46 issues would proceed. The General Assembly removed certain Act 1998–46 disputes from the ordinary adjudication process, stating that "[t]he Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of sections 691(c) and 696 of the act and issues related to collective bargaining arising under those sections." Act 1998–46, § 27.

After the declaration of distress, the financial condition of the School District continued to deteriorate. In fiscal year 2011–12, the School District's funding dropped more than $300 million compared to the prior year. In response, the SRC reduced the School District's expenditures, largely through staffing reductions. At the start of the 2010–11 school year,

the School District had 25,950 employees. The number of employees was reduced to 22,696 at the start of the 2011–12 school year.

To date, government authorities have taken no sustaining actions to stabilize the School District's financial condition. As the 2013–14 fiscal year approached, the SRC announced that it would close 24 schools, while still projecting a $304 million funding gap. The SRC again slashed the budget for expenditures including additional, significant staff reductions, and reductions in instructional materials and supplies, enrichment opportunities for students, extracurricular programs, central administrative support, and cleaning services. These reductions had a significant, negative impact. Forty schools lack their own guidance counselor. Three out of four schools that have more than a thousand students have no librarian or librarian assistant. When the 2013–14 school year commenced, the School District had 17,498 employees, a third fewer than only three years earlier.

Commencing in January 2013, the SRC and the Philadelphia Federation of Teachers, Local 3, AFT, AFL–CIO ("Respondent") engaged in negotiations regarding the parties' collective bargaining agreement ("CBA") which was due to expire on August 31, 2013. Unsurprisingly, the parties have been unable to come to a successor agreement.

Attempting to avail themselves of the General Assembly's fast-track adjudication process, Petitioners SRC and the School District filed the instant Application for Leave to File Original Process and an Exclusive Jurisdiction Complaint for Declaratory Judgment ("Complaint") in this Court. Petitioners state that the financial condition of the School District is dire, as a projected $100 million deficit for the 2014–15 school year could balloon to over $200 million. In the midst of this continuing crisis in underfunding, there is uncertainty about the parties' respective positions in the collective bargaining process. Petitioners request a declaration that, since the CBA has expired, the SRC has the right to unilaterally implement changes to work rules and practices which Section 696(k)(2) expressly declares fall outside the scope of what would other-

wise be mandatory subjects of collective bargaining. Petitioners request a declaration of their rights in the collective bargaining process particularly with respect to their ability to take what they say is a more flexible approach to seniority-based provisions. They assert that in order to ensure the greatest provision of services to students while also making critical reductions in expenditures, the SRC must make staffing decisions which are not controlled by seniority preferences.

Petitioners acknowledge that following the expiration of the CBA, the SRC has made decisions which deviate from the expired CBA. Petitioners recognize that the parties have the duty to maintain the status quo with respect to mandatory subjects of bargaining after the expiration of a CBA, but they argue that this duty does not extend to non-mandatory subjects of bargaining. Complaint at 29 (citing, *inter alia, In re Appeal of Cumberland County Sch. Dist.,* 483 Pa. 134, 394 A.2d 946, 951 (1978)). Thus, following the expiration of the CBA, the SRC has made personnel decisions that do not use seniority as a determinative factor. For example, approximately half of the two hundred school counselors recalled by the district this past school year were recalled out of seniority order. Petitioners explain that these non-seniority based recalls were made to provide the best educational service possible in straitened circumstances, with the primary focus being on ensuring that the most qualified counselor was placed in the appropriate school. Respondent, however, has filed grievances challenging these non-seniority recalls. Petitioners state that the order in which employees are recalled from layoff status is a non-mandatory bargaining topic per Section 696(k)(2)(ii).

Petitioners also state that the SRC no longer adheres to the expired CBA's restrictions on its ability to "level," which petitioners define as the "process that historically has occurred in the first two months of the school year and involves adjusting the number and types of teachers assigned to each school in light of the school's actual enrollment figures once school gets underway in September." Complaint at 18. The

expired CBA provided that the SRC could not level after mid-October, even though enrollments change throughout the school year, and that transfers of teachers out of a school could be done only in inverse order of seniority. In October 2013, the SRC unilaterally implemented new leveling procedures which provided that seniority was a factor, but not a controlling one. Pursuant to the new procedures, the principal of a school may override that factor if he or she determines that the loss of the services provided by a less senior teacher would impair the educational process and create staffing problems. Petitioners state that leveling during the 2013–14 school year has affected 165 teachers. In only four of those cases were seniority exceptions made; the union filed grievances challenging all four of those transfers. Petitioners state that these leveling decisions are non-mandatory subjects of bargaining per Section 696(k)(2)(iii).

Petitioners request a declaration that these and related issues are not mandatory topics of bargaining, and a declaration to that effect by this Court would guide the ongoing collective bargaining process, including informing the parties what issues the SRC could act upon unilaterally while collective bargaining was proceeding. Petitioners argue that this dispute falls within this Court's exclusive jurisdiction because they are requesting a declaratory judgment concerning issues related to collective bargaining arising under Sections 691(c) and 696.

I offer no opinion as to whether Petitioners are entitled to declarations which favor their position in the collective bargaining process. I am also neither a proponent of, nor an adherent of, the General Assembly's recent predilection to vest direct adjudicatory responsibility in this Court over certain subject matters. Nevertheless, so long as legislative terms have meaning, and absent some constitutional infirmity in the Legislature's determination to vest "exclusive" jurisdiction in this Court to consider "collective bargaining issues arising under" sections 691(c) and 696—and none has been

argued here—I believe we are duty-bound to engage in the review requested here.[1]

I respectfully dissent.

Justice BAER joins this dissenting statement.

1. This Court has explained the concept of exclusive jurisdiction as follows:

> What does the phrase "exclusive jurisdiction" commonly and ordinarily [sic] connote or mean? Almost half century ago, the Superior Court in *Commonwealth v. Supt. House of Correction,* 64 Pa.Super. 613, 623 [(1916)], interpreting "exclusive jurisdiction" as used in a statute, said: "Nor can there be any doubt as to the meaning the legislature intended to give to the word exclusive. In its usual and generally accepted sense, as given by lexicographers, and in the ordinary speech of the people, it means,—possessed to the exclusion of others; appertaining to the subject alone, individual, sole; to confer exclusive jurisdiction on one court deprives all other courts of such jurisdiction, whether theretofore exclusive or concurrent, conferred by statute." 3, Words and Phrases, 2550; possessed and enjoyed to the exclusion of others; debarred from participation and enjoyment to any other; nor including, admitting or pertaining to any other; opposed to inclusive: 17 Cyc. 871.2. *See also: The Oxford English Dictionary,* (1933), Vol. III, p. 384. The word "exclusive" is of Latin derivation—"ex" meaning "out" and "claudere" meaning "to shut". "Exclusive" precludes any idea of co-existence and its usual, ordinary and generally accepted meaning is "sole", "undivided" and "possessed to the exclusion of others".

*Harris–Walsh, Inc. v. Borough of Dickson City,* 420 Pa. 259, 216 A.2d 329, 334 (1966).